1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JOANNA LEAH HONEY,                    ) Case No. CV 14-5756-JPR
                                      )
                Plaintiff,            )
                                      )
        vs.                           ) MEMORANDUM OPINION AND ORDER
                                      ) AFFIRMING COMMISSIONER
                                      )
CAROLYN W. COLVIN, Acting             )
Commissioner of Social                )
Security,                             )
                                      )
                Defendant.            )
_____         )

**I.   PROCEEDINGS**

        Plaintiff seeks review of the Commissioner's final decision
denying her application for disability insurance benefits
("DIB").  The parties consented to the jurisdiction of the
undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).  The
matter is before the Court on the parties' Joint Stipulation,
filed June 15, 2015, which the Court has taken under submission
without oral argument.  For the reasons stated below, the
Commissioner's decision is affirmed and judgment is entered in
her favor.

1

**II.   BACKGROUND**

Plaintiff was born in 1975.  (Administrative Record ("AR") 150.)  She completed 11th grade and worked as a sales representative.  (See AR 72, 81-82, 190, 196-202.)

On September 29, 2010, Plaintiff filed an application for DIB.  (See AR 88, 150-53.)  She alleged that she had been unable to work since July 1, 2008, because of "[s]evere depression," anxiety, and panic attacks.  (AR 150, 189.)  Plaintiff later alleged that she also had asthma and "joint pain from rheumatoid arthritis."  (AR 280.)  After her application was denied, she requested a hearing before an Administrative Law Judge.  (AR 62-63, 113-14.)  A hearing was held on March 5, 2013, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert ("VE").  (AR 64-87.)  In a written decision issued March 14, 2013, the ALJ found Plaintiff not disabled.  (AR 18-30.)  On May 29, 2014, the Appeals Council denied Plaintiff's request for review.  (AR 1-5.)  This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.  See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance.

2

1  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.
2  Admin., 466 F.3d 880, 882 (9th Cir. 2006)).   To determine whether
3  substantial evidence supports a finding, the reviewing court
4  "must review the administrative record as a whole, weighing both
5  the evidence that supports and the evidence that detracts from
6  the Commissioner's conclusion."   Reddick v. Chater, 157 F.3d 715,
7  720 (9th Cir. 1996).   "If the evidence can reasonably support
8  either affirming or reversing," the reviewing court "may not
9  substitute its judgment" for that of the Commissioner.   Id. at
10 720-21.

11 **IV.   THE EVALUATION OF DISABILITY**

12     People are "disabled" for purposes of receiving Social
13 Security benefits if they are unable to engage in any substantial
14 gainful activity owing to a physical or mental impairment that is
15 expected to result in death or which has lasted, or is expected
16 to last, for a continuous period of at least 12 months.   42
17 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257
18 (9th Cir. 1992).

19     A.   The Five-Step Evaluation Process

20     An ALJ follows a five-step sequential evaluation process to
21 assess whether someone is disabled.   20 C.F.R. § 404.1520(a)(4);
22 Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as
23 amended Apr. 9, 1996).   In the first step, the Commissioner must
24 determine whether the claimant is currently engaged in
25 substantial gainful activity; if so, she is not disabled and the
26 claim must be denied.   § 404.1520(a)(4)(i).   If she is not
27 engaged in such activity, the second step requires the
28 Commissioner to determine whether she has a "severe" impairment

3

or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. § 404.1520(a)(4)(ii). If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether it meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded. § 404.1520(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal one in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform her past work; if so, she is not disabled and the claim must be denied. § 404.1520(a)(4)(iv). The claimant has the burden of proving she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id. If that happens or if the claimant has no past relevant work, the Commissioner bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy. § 404.1520(a)(4)(v). That determination comprises the fifth and final step in the sequential analysis. § 404.1520; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

---

[1] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 404.1545; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

4

B.   <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (AR 20.)  At step two, he concluded that Plaintiff had severe impairments of depressive disorder, anxiety disorder, panic disorder, rheumatoid arthritis, and asthma.  (<u>Id.</u>)  At step three, he determined that Plaintiff's impairments did not meet or equal a listing.  (AR 21.)

At step four, the ALJ determined that Plaintiff retained the capacity to perform light work with the following relevant restrictions:

> she must avoid contact with the general public; she can occasionally interact with supervisors and co-workers; she is limited to work activity requiring only occasional performance of detailed instructions; and any goal-oriented production quotas can be met at the end of the workday or workweek, but not periodically throughout the workday.

(AR 22.)  Based upon the VE's testimony, the ALJ determined that Plaintiff could not perform her past relevant work but could perform jobs existing in significant numbers in the economy.  (AR 29-30.)  The ALJ therefore found Plaintiff not disabled.  (AR 30.)

**V.   DISCUSSION**

Plaintiff contends that the ALJ erred in failing to properly assess (1) the opinions of a treating and an examining physician, (2) her credibility, (3) her mother's third-party witness statements.  (J. Stip. at 2.)

5

A.   <u>The ALJ's Assessment of the Medical Evidence</u>

Plaintiff argues that the ALJ should have accorded more weight to the opinions of treating physician Jose Martin Itzcovich Schuster and examining psychiatrist Stephan Simonian. (<u>Id.</u> at 2-7, 12-14.)  For the reasons discussed below, remand is not warranted on this basis.

1.   <u>Applicable law</u>

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2) those who examined but did not treat the plaintiff, and (3) those who did neither.  <u>Lester</u>, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than that of an examining physician, and an examining physician's opinion is generally entitled to more weight than that of a nonexamining physician.  <u>Id.</u>

This is true because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant.  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th Cir. 1996). If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.  § 404.1527(c)(2). If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors.  § 404.1527(c)(2)-(6).

6

When a treating or examining physician's opinion is not contradicted by other evidence in the record, it may be rejected only for "'clear and convincing'" reasons.  <u>See</u> <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting <u>Lester</u>, 81 F.3d at 830-31).  When it is contradicted, the ALJ must provide only "'specific and legitimate reasons'" for discounting it.  <u>Id.</u> (quoting <u>Lester</u>, 81 F.3d at 830-31).  The weight given an examining physician's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things.  § 404.1527(c)(3)-(6).

2.   <u>Relevant facts</u>[3]

On February 21, 2008, Dr. Gary Schneider, a family practitioner at Lakeside Community Healthcare,[4] noted that Plaintiff was tearful and complained of experiencing work stress for one year, weight loss, and vomiting.[5]  (AR 302.)  He diagnosed depression and prescribed Zoloft.[6]  (<u>Id.</u>)

On July 15, 2008, Dr. Schneider noted that Plaintiff complained of "feeling very anxious" and was tearful and crying.

---

[3]   Because Plaintiff does not challenge the ALJ's assessment of her physical impairments, the medical evidence regarding them is not summarized.

[4]   The Lakeside Community Healthcare website lists Dr. Schneider's specialty as family practice.  Find a Physician, Lakeside Community Healthcare, http://www.lakesidecommunity healthcare.com/lmgmembers.cfm?m=phys (search for Schneider).

[5]   Dr. Schneider's handwritten notes are difficult to read, and parts are illegible.

[6]   Zoloft, or sertraline, is a selective serotonin reuptake inhibitor used to treat depression and anxiety.  <u>Sertraline</u>, MedlinePlus, https://www.nlm.nih.gov/medlineplus/druginfo/ meds/a697048.html (last updated Nov. 15, 2014).

(AR 301.)  She reported an episode of "heart palpitations" and
"numbness," daily diarrhea "except when not at work," and
vomiting.  (Id.)  Plaintiff had increased her dosage of Zoloft,
which "helped somewhat."  (Id.)  He diagnosed "severe
anxiety/depression" and noted, "out on disability."  (Id.)

On July 29, 2008, Dr. Schneider noted that Plaintiff was
"feeling better"; she was no longer having heart palpitations or
numbness, and her diarrhea had subsided.  (AR 300.)  He diagnosed
"severe" anxiety and depression and advised her to continue
taking Zoloft.  (Id.)  On November 12, 2008, it appears, Dr.
Schneider completed medication forms but did not provide other
treatment.  (AR 300 (noting "forms for meds" and Plaintiff's
"undergoing litigation" with former employer).)

On February 24, 2009, Dr. Schneider noted that Plaintiff's
diarrhea and nausea had "re-started," she continued to be
depressed, and she was having "significant" mood swings.  (AR
298.)  He diagnosed depression and possible "ADD" and advised her
to "add Wellbutrin."[7]  (Id.)  On May 20, 2009, Dr. Schneider
noted that Plaintiff still complained of anxiety, sleep
disturbances, and "severe depression"; he "extend[ed] disabilty"
by two months.  (Id.)  On September 9, 2009, Dr. Schneider noted
that Plaintiff "wants to go back to work" and that her
concentration and "sense of fatigue" were "still improved."  (AR
297.)  He wrote, "release of disability."  (AR 297.)

On September 29, 2010, more than a year later, Dr. Schneider

---

[7]  Wellbutrin, or bupropion, is an antidepressant.
Bupropion, MedlinePlus, https://www.nlm.nih.gov/medlineplus/
druginfo/meds/a695033.html (Sept. 15, 2014).

8

noted that Plaintiff had been unemployed for more than two years and was "still very depressed." (AR 295.) He diagnosed major depression and noted, "Need SSI or SSDI." (Id.)

On February 23, 2011, Dr. Simonian, a board-certified psychiatrist, examined Plaintiff at the Social Security Administration's request. (AR 311-15.) Plaintiff reported panic attacks, feeling overwhelmed, shaking "a lot," vomiting several times a day, losing weight, depression, and wanting to die. (AR 311-12.) Upon examination, Dr. Simonian found that Plaintiff's affect was "mildly constricted, but appropriate to content of the discussion"; her mood was sad; and she was "tearful at times." (AR 313.) She was alert, oriented, and properly dressed; her hygiene was good, speech and psychomotor activity normal, and thought process coherent and not tangential. (Id.) Plaintiff's intellectual functioning, memory, comprehension, abstract thinking, and ability to calculate were all intact and average, and she had no delusional thinking, hallucinations, or suicidal or homicidal ideation. (AR 313-14.)

Dr. Simonian diagnosed depressive disorder, generalized anxiety disorder, and possible panic disorder. (Id.) He opined that Plaintiff had an unlimited ability to understand, remember, and carry out simple and complex instructions and perform work activities without special supervision. (AR 315.) He opined that she was moderately limited in her ability to interact with supervisors, coworkers, and the public; maintain concentration and attention; adapt to common workplace stresses; maintain regular work attendance; and consistently perform work activities. (Id.)

9

On March 8, 2011, psychologist Kim Morris reviewed Plaintiff's medical records and completed psychiatric-review-technique and mental-residual-functional-capacity-assessment forms.  (AR 326-42.)  On the PRT form, Dr. Morris checked the boxes indicating that Plaintiff's depression and anxiety resulted in mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (AR 329-30, 334.)

On the mental-RFC-assessment form, Dr. Morris checked the boxes indicating that Plaintiff was not significantly limited in her ability to remember locations and worklike procedures; understand, remember, and carry out simple instructions; maintain attention and concentration; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places; use public transportation; and set realistic goals or make plans independently of others.  (AR 337-38.)  She was moderately limited in her ability to understand, remember, and carry out detailed instructions; perform activities within a schedule; maintain regular attendance; be punctual; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychological symptoms; perform at a consistent pace; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers; maintain socially

appropriate behavior; adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting.  (Id.)

In the section of the form for explaining her findings, Dr. Morris wrote that Plaintiff had "sufficient ability" to understand and remember simple and complex instructions; complete simple instructions; follow directions without additional assistance; "maintain adequate attention, concentration, persistence and pace as needed to complete a full work day/work week"; "maintain appropriate behavior in a context of limited peer and public contact"; "accept[] simple instructions and respond[] appropriately to feedback from supervisors"; "be aware of ordinary hazards"; make simple decisions; "utilize transportation"; and "cope with the demands of a routine work-like environment."  (AR 339.)

On August 31, 2011, Dr. Sharmin Jahan, a board-eligible psychiatrist, performed a complete psychiatric evaluation of Plaintiff at the Social Security Administration's request.  (AR 357-61.)  Dr. Jahan noted that Plaintiff was "well dressed and reasonably groomed" and "cooperative throughout the evaluation." (AR 357.)  She reported suffering from mental illness, anxiety, and "repeated disability" all her life; she claimed to be "unable to function due to her extreme anxiety," and "[w]henever she thinks about returning to her work, she has fearfulness and anxiety and is unable to concentrate."  (AR 358.)  Plaintiff reported that she was unable to handle stress, felt anxious, was throwing up, could not find a job, and could not function properly.  (Id.)  She denied sleep changes or suicidal or

11

homicidal ideation.  (<u>Id.</u>)  Plaintiff was taking Zoloft, which
was prescribed by her primary-care physician, and she was not
seeing a psychiatrist.  (AR 358-59.)  She reported that she was
able to eat, dress, and bathe independently; do some household
chores, errands, shopping, and cooking; and manage her own money.
(AR 359.)

     Upon examination, Dr. Jahan found that Plaintiff was
"extremely tearful and labile," with an anxious mood and affect.
(AR 359-60.)  But she also found that Plaintiff was "calm and not
restless"; "directable, focused and not distractible"; alert and
oriented; and "interested in the interview."  (<u>Id.</u>)  Her speech
was "spontaneous and fluent"; her attention, recall, memory,
insight, and judgment were intact; and her fund of knowledge was
average.  (AR 360.)  Her thoughts were "logically connected with
an adequate flow of ideas and no instances of thought
derailment," she was "able to express her own personal history,"
and she had no suicidal, homicidal, or paranoid ideation.  (<u>Id.</u>)
Dr. Jahan also noted that Plaintiff's clothing was clean and
appropriate, and she had adequate hygiene.  (AR 359.)  Dr. Jahan
diagnosed "Anxiety Disorder, not otherwise specified, mild."  (AR
360.)

     Under "Functional Assessment," Dr. Jahan noted that
Plaintiff "appeared to be extremely tearful and labile while
describing her symptoms" but "did not take any psychotropic
medications and does not see any psychiatrist and appear[s] to
comprehend well without any difficulties."  (AR 361.)  She opined
that Plaintiff's ability to understand, remember, and perform
simple tasks was intact; her ability to understand, remember, and

12

perform complex tasks was "mildly limited"; and her ability to interact with the public, coworkers, and supervisors was "mildly limited." (Id.)  Dr. Jahan "highly recommended" that Plaintiff seek psychiatric treatment and noted that her prognosis was fair. (Id.)

From October 14, 2011, to January 6, 2012, Plaintiff received counseling for anxiety and depression at the San Fernando Valley Counseling Center.  (AR 367-77.)  Her counseling sessions largely focused on her relationship with her mother. (Id.)  Plaintiff reportedly ended treatment because of "financial strains."  (AR 370.)

On March 30, 2012, Dr. Schneider noted that Plaintiff's "chief complaint" was that she "wants to discuss disability status."  (AR 365.)  He noted that she continued to have mood lability, sleep disturbance, isolation, and tearfulness, and he diagnosed possible bipolar disorder.  (Id.)  He appears to have referred Plaintiff to Dr. Schuster.  (Id.)

On May 8, 2012, Dr. Schuster, who appears to have specialized in psychiatry,[8] noted that Plaintiff reported a history of depression and anxiety and felt sad, "dark," and scared.  (AR 396.)  Plaintiff complained of difficulty sleeping, panic attacks twice a month on average, fluctuating weight, decreased cognitive function and concentration, and rage.  (AR

_____

   [8]  The Medical Board of California's website shows Dr. Schuster's area of practice as psychiatry but does not list any board certifications.  See BreEZe Online License Verification, Medical Board of California, http://www.mbc.ca.gov/Breeze/License_Verification.aspx (search for Itzcovich-Schuster, Jose Martin).

395-96.)   Dr. Schuster noted that Plaintiff was "sad" and
"tearful" and diagnosed dysthymic disorder, panic disorder, and
possible bipolar disorder.   (AR 394-95.)   He prescribed Lamictal
(a brand name for the generic lamotrigine)[9] and instructed
Plaintiff to continue taking Zoloft.   (Id.)

On June 5, 2012, Plaintiff advised Dr. Schuster by phone
that her medication was not making "much difference"; Dr.
Schuster instructed her to increase her dose each week.   (Id.)
On June 22, 2012, Plaintiff reported by phone that she was
getting "emotional"; Dr. Schuster instructed her to increase her
dosage.   (Id.)

On July 12, 2012, Dr. Schuster noted that Plaintiff had
obtained a part-time job in sales and was sleeping an average of
six and a half to seven hours a night, with no naps.   (AR 393.)
He instructed her to taper off Zoloft, start Effexor (a brand
name for the generic venlafaxine),[10] and continue Lamictal.   (AR
393.)   On August 16, 2012, Plaintiff advised Dr. Schuster by
phone that she was having withdrawal symptoms from discontinuing
Zoloft, was feeling "very overwhelmed," and had cut herself to
"release anxieties."   (Id.)   Dr. Schuster advised Plaintiff to
increase her dosage of medication.   (Id.)   On August 31, 2012,

─────────────

[9]   Lamictal, or lamotrigine, is an anticonvulsant used to
increase the time between episodes of depression, mania, and
other abnormal moods in people with bipolar disorder.
Lamotrigine, MedlinePlus, https://www.nlm.nih.gov/medlineplus/
druginfo/meds/a695007.html (last updated Feb. 1, 2011).

[10]   Effexor, or venlafaxine, is a selective serotonin and
norepinephrine reuptake inhibitor used to treat depression and
anxiety.   Venlafaxine, MedlinePlus, https://www.nlm.nih.gov/
medlineplus/druginfo/meds/a694020.html (last updated Nov. 15,
2014).

14

Plaintiff reported by phone that she was tearful, feeling down, "stressed out," and having panic attacks three times a week but continued to work part-time.[11]  (Id.)  A medication list shows that on December 12, 2012, Dr. Schuster refilled Plaintiff's prescription for venlafaxine at the same dosage as on July 12, but the file contains no treatment note for that date.  (AR 392.)

On February 27, 2013, about a week before Plaintiff's hearing, Dr. Schuster completed a mental-impairment questionnaire.  (AR 386-91.)  He wrote that Plaintiff suffered from bipolar disorder II, which was treated with lamotrigine and Effexor.  (AR 386.)  He listed his clinical findings as dysphoria, depression, hostility, insomnia, anergia, and irritability.[12]  (Id.)  In the section for listing Plaintiff's signs and symptoms, Dr. Schuster checked the boxes for anhedonia;[13] decreased energy; blunt, flat, or inappropriate

---

[11]  As the Commissioner notes (J. Stip at 9, 10), Dr. Schuster appears to have seen Plaintiff in person only twice, on May 8 and July 12, 2012, and consulted with her by phone on June 6 and 22 and August 16 and 31 (see AR 394 (noting "tel. call" in body of June 5 and 22 notes), 393 (noting "tel." in margin below date of Aug. 16 and 31 notes)).  Plaintiff does not dispute that four of the six notes reflect phone consultations, not in-person appointments.

[12]  Dysphoria is a state of feeling unwell or unhappy. Dysphoria, Merriam-Webster, http://www.merriam-webster.com/dictionary/dysphoria (last accessed Aug. 18, 2015).  Anergia is a lack of energy.  Anergia, Merriam-Webster, http://www.merriam-webster.com/dictionary/anergia (last accessed Aug. 18, 2015).

[13]  Anhedonia is a psychological condition characterized by inability to experience pleasure in normally pleasurable acts. Anhedonia, Merriam-Webster, http://www.merriam-webster.com/dictionary/anhedonia (last accessed Aug. 24, 2015).

15

affect; feelings of guilt or worthlessness; generalized
persistent anxiety; mood disturbance; difficulty thinking or
concentrating; psychomotor agitation or retardation; pathological
dependence, passivity, or "aggressivity"; persistent disturbances
of mood or affect; bipolar syndrome with episodic periods of
mania and depression; intense and unstable interpersonal
relationships and impulsive and damaging behavior; motor tension;
emotional lability; manic syndrome; and easy distractibility.
(AR 387.)

    Regarding Plaintiff's functional limitations, Dr. Schuster
checked boxes stating that she was "unable to meet competitive
standards" in remembering worklike procedures and was "seriously
limited [in], but not precluded" from, performing 22 other tasks,
including understanding, remembering, and carrying out short and
simple instructions; maintaining attention for two hours;
maintaining regular attendance; making simple work-related
decisions; completing a normal workday and workweek; asking
simple questions; accepting instructions and responding
appropriately to criticism from supervisors; getting along with
coworkers; dealing with normal work stress; being aware of normal
hazards and taking appropriate precautions; interacting
appropriately with the general public; and maintaining socially
appropriate behavior.  (AR 388-89.)  He believed that she had a
"limited but satisfactory" ability to sustain an ordinary routine
without special supervision and to work in coordination with or
proximity to others without being unduly distracted.  (AR 388.)
He opined that Plaintiff was moderately restricted in performing
activities of daily living; maintaining social functioning; and

16

maintaining concentration, persistence, and pace.  (AR 390.)  Dr.
Schuster also checked a box on the form indicating that Plaintiff
had a "residual disease process that has resulted in such
marginal adjustment that even a minimal increase in mental
demands or change in the environment would be predicted to cause
the individual to decompensate."  (Id.)  He believed Plaintiff's
impairments or treatment would cause her to miss more than four
days of work a month.  (AR 391.)  He left blank the section of
the form for indicating the frequency and length of his contact
with Plaintiff.  (AR 386.)

### 3.  Discussion

The ALJ determined that Plaintiff retained an RFC to perform
light work that required no contact with the general public, only
occasional interaction with supervisors and coworkers, only
occasional performance of detailed instructions, and limited
production quotas.  (AR 22.)  In doing so, he accorded "little
weight" to the opinions of Drs. Schuster and Simonian.  (AR 27-
28.)  The ALJ also accorded "little weight" to Dr. Jahan's
opinion that Plaintiff had only some mild limitations because
"the objective evidence clearly shows the existence of a
longstanding and severe mental impairment that results in
significant work-related limitations."  (AR 28.)  The ALJ
"reject[ed]" Dr. Morris's opinion in part because the limitations
she assessed in the narrative portion of the report were
inconsistent with the boxes she checked in a different portion of
the report.  (Id.)  Plaintiff does not challenge the ALJ's
assessment of Drs. Jahan's and Morris's opinions, but he contends
that he erroneously discounted Drs. Schuster's and Simonian's.

17

As an initial matter, even though the ALJ accorded little weight to Drs. Schuster's and Simonian's opinions, he actually incorporated many of their functional-limitation findings into Plaintiff's RFC. For example, Dr. Simonian found that Plaintiff was moderately limited in her ability to interact with supervisors, coworkers, and the public, and Dr. Schuster found that she was "seriously limited" in those areas. (AR 315, 388-89.) Those limitations appear consistent with the ALJ's finding that Plaintiff could never interact with the general public and only occasionally interact with supervisors and coworkers. (AR 22.) Dr. Simonian also found that Plaintiff could carry out simple and complex instructions but her ability to maintain concentration and attention was moderately limited (AR 315), which appears consistent with the ALJ's determination that Plaintiff could only occasionally perform detailed instructions (AR 22). Dr. Simonian also found that Plaintiff's ability to consistently perform work activities was moderately limited (AR 315), which appears consistent with the ALJ's limitations regarding production quotas (AR 22).

Moreover, contrary to Plaintiff's contentions (J. Stip. at 3-5), the ALJ provided specific and legitimate reasons for discounting Dr. Schuster's controverted opinion. First, as the ALJ found, Dr. Schuster's opinion was based on a "very short treatment history." (AR 27.) Indeed, although Plaintiff claims to have been totally disabled by her psychological impairment since July 2008, Dr. Schuster's notes show that he treated Plaintiff for only about three months, from May to August 2012. (See AR 392-96.) During that time, Plaintiff spoke with Dr.

18

1  Schuster by phone four times and saw him in person only twice.

2  (See id.)  Other than a notation on a medication chart that Dr.

3  Schuster refilled Plaintiff's prescription for venlafaxine in

4  December 2012 (AR 392), nothing shows that he treated her from

5  September 2012 until February 27, 2013, when he opined that her

6  psychological impairments rendered her essentially

7  unemployable.[14]  Dr. Schuster, moreover, left blank the section

8  of the form for indicating the "[f]requency and length of [his]

9  contact" with Plaintiff.  (AR 386.)  The ALJ was entitled to

10 consider the length and nature of Dr. Schuster's treatment

11 relationship with Plaintiff in determining how much weight to

12 afford his opinion.  See § 404.1527(c)(2)(i)-(ii) (in weighing

13 treating-physician opinion, ALJ will consider "[l]ength of the

14 treatment relationship," "frequency of examination," and

15 "[n]ature and extent" of relationship"); Ghanim v. Colvin, 763

16 F.3d 1154, 1161 (9th Cir. 2014) (in weighing treating-physician

17 opinion, ALJ is "required" to consider factors in

18 § 404.1527(c)(2)-(6)); Hinojos v. Astrue, No. 1:11-CV-01530-SKO,

19 2012 WL 6738224, at *11 (E.D. Cal. Dec. 28, 2012) (ALJ

20 permissibly accorded less weight to opinion of treating physician

21 in part because he treated plaintiff only "once a month over

22 three months").

23

---

24  [14]  Plaintiff contends that Dr. Schuster treated her for "at
least 7 months" because "the doctor's records reflect a
25 medication adjustment on December 12, 2012." (J. Stip. at 4 &
n.4 (citing AR 392).)  As discussed, however, the December 2012
26 entry simply notes that Dr. Schuster refilled Plaintiff's
prescription at the same dosage as in July 2012; no progress note
27 accompanies that notation, and nothing else indicates that he
otherwise treated Plaintiff at any point after August 2012.  As
28 such, Plaintiff's contention is not persuasive.

1    Second, the ALJ permissibly discounted Dr. Schuster's
2  opinion because the doctor's progress notes did not support it.
3  (AR 27.)  As the ALJ found, Dr. Schuster opined that Plaintiff
4  had "very restrictive work-related limitations" (id.), such as an
5  inability to remember worklike procedures and a seriously limited
6  ability to understand, remember, and carry out "very short and
7  simple instructions," maintain attention for two hours, make
8  "simple work-related decisions," ask simple questions, be aware
9  of normal hazards, maintain socially appropriate behavior, and
10  adhere to "basic standards of neatness and cleanliness" (AR 388-
11  89).  He further opined that even a "minimal increase" in mental
12  demands or a change in the environment would cause Plaintiff to
13  "decompensate."  (AR 390.)
14    But as the ALJ found, while Dr. Schuster's sparse progress
15  notes "offer very detailed descriptions of [Plaintiff's]
16  complaints," they contain "very little in terms of significant
17  clinical or objective findings."  (AR 27; see, e.g., AR 395
18  (noting that Plaintiff "c/o," or complained of, decreased
19  cognitive function and concentration but not showing any
20  independent assessment).)  Indeed, Dr. Schuster's progress notes,
21  which total four handwritten pages, note Plaintiff's reports of
22  her symptoms and observe that she was sad and tearful (AR 393,
23  395) and denied suicidal and homicidal ideation (AR 393), but
24  they fail to reflect any other objective findings, such as an
25  assessment of Plaintiff's appearance, behavior, memory,
26  cognition, judgment, insight, or speech.  (Compare AR 393-96 (Dr.
27  Schuster's notes) with AR 313-14 (Dr. Simonian's mental-status-
28  examination findings regarding orientation, appearance/behavior,

speech, thought processes, mood and affect, thought content, intellectual functioning, memory, comprehension, abstract thinking, and calculations), and AR 359-60 (Dr. Jahan's mental-status-examination findings regarding appearance, behavior, cooperation, speech, sensorium and cognition, affect and mood, perception, thought content, thought process, and insight and judgment).)  The ALJ therefore permissibly discounted Dr. Schuster's opinion because it was inadequately supported by his treatment notes and clinical findings.[15]  See Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (ALJ "need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings"); accord Batson v. Comm'r Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004) (same); cf. Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (when ALJ properly discounted claimant's credibility, he was "free to disregard" doctor's opinion that was premised on claimant's subjective complaints).

The ALJ also gave specific and legitimate reasons for discounting the opinion of examining psychiatrist Simonian. First, the ALJ reasonably found that "the findings contained in

---

[15]  Dr. Schuster's finding of significant limitations also appears inconsistent with his notations that Plaintiff cared for her young son, of whom she had 50 percent custody (see AR 396 (noting that Plaintiff had one nine-year-old son "50% of time"); see also AR 21 (ALJ's finding that Plaintiff did not have "marked" restriction of activities of daily living because she was "able to care for her young son including preparing his meals, getting him dressed, and taking him to and from school")), and was working part-time in sales during the period he was treating her (AR 393 (noting on July 12 and Aug. 31, 2012, that Plaintiff was working in sales)).

1  the body of Dr. Simonian's narrative report are simply not
2  consistent with the significant limitations opined." (AR 28.)
3  Indeed, upon examination, Dr. Simonian found that Plaintiff was
4  sad and tearful "at times" and her affect was "mildly
5  constricted, but appropriate to content of the discussion" (AR
6  313), but his other findings were essentially normal: Plaintiff
7  was alert and oriented, with good hygiene, normal speech and
8  psychomotor activity, coherent thought processes, and intact and
9  average intellectual functioning, memory, comprehension, abstract
10 thinking, and ability to calculate (AR 313-14).  Such benign
11 findings fail to support Dr. Simonian's opinion that Plaintiff
12 had moderate limitations on her ability to interact with others,
13 maintain concentration and attention, adapt to work stresses,
14 maintain regular attendance, and perform work activities
15 consistently.  (AR 315); see Thomas, 278 F.3d at 957; Batson, 359
16 F.3d at 1195.

17       The ALJ also discounted Dr. Simonian's opinion because it
18 was "not consistent with the other medical evidence of record."
19 (AR 28); § 404.1527(c)(4) ("Generally, the more consistent an
20 opinion is with the record as a whole, the more weight we will
21 give to that opinion.").  Indeed, as discussed above, Dr.
22 Schuster did not note any significant clinical findings, and the
23 other physician who examined Plaintiff, Dr. Jahan, found that
24 Plaintiff was calm, alert, oriented, cooperative, focused, and
25 not distracted and had "spontaneous and fluent" speech, logical
26 thought process, and intact memory, attention, recall, insight,
27 and judgment.  (AR 360; see also AR 24 (summarizing Dr. Jahan's
28 findings).)  Plaintiff nevertheless argues that the ALJ's finding

22

was not a sufficient reason for discounting Dr. Simonian's opinion because the "ALJ does not specify what other medical evidence he is referring to." (J. Stip. at 6.) But the ALJ thoroughly summarized the medical evidence elsewhere in the opinion (see AR 24-27) and explained why that evidence failed to show that Plaintiff's mental impairments were disabling (AR 26 (noting gaps in treatment and "paucity of supporting clinical evidence")). In any event, even if the ALJ erred by failing to adequately specify what evidence was inconsistent with Dr. Simonian's opinion, see Embrey v. Bowen, 849 F.2d 418, 421 (9th Cir. 1988) ("To say that medical opinions are not supported by sufficient objective findings . . . does not achieve the level of specificity our prior cases have required . . . ."), it was harmless because he gave another specific and legitimate reason for according less weight to that opinion, see Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (nonprejudicial or irrelevant mistakes are harmless).

In sum, Plaintiff has shown, at most, that the medical evidence could have been interpreted differently, which is insufficient to warrant reversal.[16] See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."). Plaintiff is not entitled to remand on this ground.

_____

[16] Plaintiff points to no evidence at all showing that she was disabled at any time between September 2009, when Dr. Schneider noted that she was improved and "releas[ed]" her from "disability" (AR 297), and September 2010, when he found her to be "very depressed" and in need of "SSI or SSDI" (AR 295).

23

B.    The ALJ's Assessment of Plaintiff's Credibility

Plaintiff contends that the ALJ failed to provide legally sufficient reasons for discounting her credibility.  (J. Stip. at 14-18, 21-23.)

1.    Applicable law

An ALJ's assessment of symptom severity and claimant credibility is entitled to "great weight."  See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986) (as amended).  "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d at 1035-36.  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment '[that] could reasonably be expected to produce the pain or other symptoms alleged.'"  Id. at 1036 (citing Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen, 80 F.3d at 1282 (emphasis in original).

If the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion.  See Berry v.

24

1    <u>Astrue</u>, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent a finding or

2    affirmative evidence of malingering, the ALJ must provide "clear

3    and convincing" reasons for rejecting the claimant's testimony.

4    <u>Brown-Hunter v. Colvin</u>, __ F.3d __, 2015 WL 4620123, at *5 (9th

5    Cir. Aug. 4, 2015); <u>Treichler v. Comm'r of Soc. Sec. Admin.</u>, 775

6    F.3d 1090, 1102 (9th Cir. 2014); <u>Ghanim</u>, 763 F.3d at 1163 & n.9.

7         In assessing a claimant's credibility, the ALJ may consider

8    (1) ordinary techniques of credibility evaluation, such as the

9    claimant's reputation for lying, prior inconsistent statements,

10   and other testimony by the claimant that appears less than

11   candid; (2) unexplained or inadequately explained failure to seek

12   treatment or to follow a prescribed course of treatment; (3) the

13   claimant's daily activities; (4) the claimant's work record; and

14   (5) testimony from physicians and third parties.  <u>Rounds v.</u>

15   <u>Comm'r Soc. Sec. Admin.</u>, __ F.3d __, 2015 WL 4620150, at *7 (9th

16   Cir. May 7, 2015); <u>Thomas</u>, 278 F.3d at 958-59.  If the ALJ's

17   credibility finding is supported by substantial evidence in the

18   record, the reviewing court "may not engage in second-guessing."

19   <u>Thomas</u>, 278 F.3d at 959.

20                    2.   <u>Relevant background</u>

21        In an undated disability report, Plaintiff stated that she

22   had been unable to work since July 1, 2008, because of severe

23   depression, anxiety, and panic attacks.  (AR 189.)  In a December

24   2010 function report, Plaintiff listed her daily activities as

25   taking her son to school and picking him up every other day,

26   sleeping "a lot" during the day, eating lunch, watching a little

27   television, and sometimes showering.  (AR 203, 207.)  She took

28   care of her eight-year-old son 50 percent of the time "[w]ith the

                                   25

help of [her] mother" and drove him to school and made his lunch.
(AR 204-05.)  Plaintiff didn't care how she dressed and didn't
brush or wash her hair every day.  (Id.)  Her mother cooked all
the meals and did the shopping, although Plaintiff did laundry
twice a month.  (AR 204-06.)  Plaintiff went outside once a day
and was able to drive.  (AR 206.)  She got "nervous" and had
diarrhea when she had to deal with money, had frequent panic
attacks, cried a lot, had mood swings, and sometimes got "very
angry."  (AR 206-08.)

Plaintiff wrote that her illness affected her ability to
talk, remember, concentrate, understand, follow instructions, and
get along with others.  (AR 208.)  She could pay attention "for a
little while," follow written instructions "pretty good," and
follow spoken instructions "ok."  (Id.)  When under stress,
Plaintiff cried and had hives, diarrhea, stomachaches, panic
attacks, insomnia, heart palpitations, and "the shakes."  (AR
209.)

In May 2011, Plaintiff completed a "Disability Report –
Appeal," stating that her "depression, anxiety and panic attacks
are worse," she "sleep[s] more during the day and less at night,"
her "diarrhea is worse," and "after [she] received the Social
Security denial, [she] couldn't stop crying."  (AR 221.)  She
wrote that she had "[d]ifficulty leaving [the] house" and
"shortness of breath because of anxiety and panic attacks, which
happen throughout the day"; she was "[t]ired but can't sleep at
night" and slept "throughout the day"; and her mind raced such
that she could not "think or concentrate."  (Id.; see also AR
224.)

1    Also in May 2011, Plaintiff completed a second function
2  report. (AR 227-34.)  She wrote that her daily activities
3  included "try[ing] to shower" and "eat[ing] something."  (AR
4  227.)  She had 50 percent custody of her son and took him to and
5  from school every other day.  (AR 228, 231.)  She was not able to
6  sleep, her mind was "always busy," and she had "bad stomachaches"
7  that gave her diarrhea and made her vomit.  (AR 228.)  Plaintiff
8  sometimes made sandwiches, but her mother cooked her meals and
9  dispensed her medicine.  (AR 228-29.)  Plaintiff did her laundry
10  about once a month, which took two or three hours.  (AR 229.)
11  She went outside about once every other day and could drive.  (AR
12  230.)  She did not shop.  (Id.)  Plaintiff was unable to pay
13  bills, handle a savings account, or use a checkbook, so her mom
14  "help[ed] [her] with that."  (Id.)
15    Plaintiff wrote that her impairments affected her ability to
16  lift, squat, bend, stand, walk, sit, kneel, talk, remember,
17  complete tasks, concentrate, understand, follow instructions, use
18  her hands, and get along with others.  (AR 232.)  She could walk
19  for 10 or 15 minutes before needing to rest for a couple of
20  minutes.  (Id.)  She could "sometimes" follow written
21  instructions "ok," and she could follow spoken instructions "ok."
22  (Id.)  She did not handle stress or changes in routine well.  (AR
23  233.)
24    At the March 2013 hearing, Plaintiff testified that she had
25  50 percent custody of her son and drove him to and from school
26  every other day.  (AR 72-73.)  She drove to the food store once
27  every month or month and a half.  (AR 74.)  She did laundry once
28  or twice a month but did not cook or do other chores because her

"mom pretty much takes care of the household while [her] stepdad goes and works." (AR 74-75.)[17] She testified that she had started seeing a psychiatrist in May 2012 but that it had been "very difficult to . . . find the money to . . . get the treatment that [she] needed" before she was approved for Medi-Cal, in January 2013. (AR 75-76; see also AR 73.) Plaintiff testified that side effects from her medication included drowsiness, being nauseated 24 hours a day, and gaining weight. (AR 77.) Despite her medication, Plaintiff was anxious and had panic attacks and trouble sleeping. (AR 77-78.)

Plaintiff testified that she had worked part-time in July 2012 for "a little over four weeks."[18] (AR 67.) She had problems with attendance at work because "every morning" that she had to go in she "couldn't stop throwing up and going diarrhea and shaking to be able to get [her]self off the floor." (AR 78-79.) Her panic attacks occurred about once a week and sometimes lasted "[h]ours." (AR 79-80.) Plaintiff testified that she could not work because she had "constant" diarrhea and nausea, "TMJ," and daily headaches. (AR 80.)

### 3. Discussion

The ALJ found that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms" but that her

---

[17] She further testified that because her mother wanted to keep her as "stress free" as possible, "not a lot [was] required" of her in taking care of herself or the house. (AR 75.)

[18] Plaintiff's testimony conflicts with her statement in her July 24, 2014 request to proceed in forma pauperis that she had worked in 2012 "for 3 months." At the very least, she worked for more than seven weeks, from at least July 12 to August 31 (see AR 393).

28

"statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (AR 23.) Reversal is not warranted based on the ALJ's alleged failure to properly consider Plaintiff's subjective complaints.

As an initial matter, the ALJ credited many of Plaintiff's subjective complaints and accommodated them when formulating her RFC. (AR 25 (ALJ noting that he was including "significant limitations" in RFC based on Plaintiff's "longstanding history of mental illness and her ongoing complaints of symptoms").) The ALJ noted Plaintiff's complaints of difficulty getting along with others (AR 23) and limited her to nonpublic work with only occasional interaction with coworkers and supervisors (AR 22). He also noted Plaintiff's complaints of anxiety and ability to pay attention for only a "little while" (AR 23) and limited her to "work activity requiring only occasional performance of detailed instructions" and "goal-oriented production quotas" that could "be met at the end of the workday or workweek, but not periodically throughout the workday" (AR 22). To the extent the ALJ rejected Plaintiff's contentions, moreover, he provided clear and convincing reasons for doing so.

First, the ALJ found that "the objective clinical findings do not support the extreme limitations alleged." (AR 24; see also AR 23, 26.) He specifically found that "[p]rogress notes from Dr. Schneider indicate very few clinical and objective findings" (AR 24; see AR 295-302, 365-66) and summarized Drs. Simonian's and Jahan's largely normal mental-status-examination findings (AR 24; see AR 311-15, 357-61). The ALJ was entitled to rely on this factor in assessing Plaintiff's credibility. See

Burch, 400 F.3d at 681 ("Although lack of medical evidence cannot
form the sole basis for discounting pain testimony, it is a
factor that the ALJ can consider in his credibility analysis.");
Carmickle, 533 F.3d at 1161 ("Contradiction with the medical
record is a sufficient basis for rejecting the claimant's
subjective testimony."); Lingenfelter, 504 F.3d at 1040 (in
determining credibility, ALJ may consider "whether the alleged
symptoms are consistent with the medical evidence").[19]

Second, the ALJ was entitled to discount Plaintiff's
credibility because her "significant gaps in treatment . . .
suggest[] that [her] symptoms may not have been as serious as"
she alleged. (AR 26); see Bunnell v. Sullivan, 947 F.2d 341, 346
(9th Cir. 1991) (en banc) (ALJ may consider "unexplained, or
inadequately explained, failure to seek treatment or follow a
prescribed course of treatment" (citation omitted)); Tommasetti
v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (same); SSR 96-7p,
1996 WL 374186, at *7 (July 2, 1996) (claimant's statements "may

_____

[19]   Although an ALJ's credibility determination is
insufficient when he "simply state[s] [his] non-credibility
conclusion and then summarize[s] the medical evidence,"
Brown-Hunter, 2015 WL 4620123, at *6, here the ALJ provided more
extensive analysis, finding that "objective clinical findings"
did not support Plaintiff's alleged "extreme limitations" (AR
24); discussing the findings of Drs. Schneider, Simonian, and
Jahan, among other evidence (AR 24-25); and concluding that "the
objective medical evidence simply does not establish consistent,
objective evidence of any disabling mental impairment since
[Plaintiff's] alleged onset date" (AR 25). See Brown-Hunter,
2015 WL 4620123, at *7 (noting that ALJ "must provide some
reasoning" so court can review credibility determination but that
"analysis need not be extensive"). As discussed below, moreover,
the ALJ gave an additional clear and convincing reason for
discounting Plaintiff's credibility.

be less credible if the level or frequency of treatment is
inconsistent with the level of complaints, or if the medical
reports or records show that the individual is not following the
treatment as prescribed and there are no good reasons for this
failure"). Specifically, the ALJ noted that Plaintiff's mental-
health treatment was "sporadic[]" and that the record contained
no evidence of mental-health treatment between July 2008 and
February 2009, September 2009 and September 2010, and September
2010 and October 2011 — periods of about seven, 12, and 13
months, respectively. (AR 26.) Between 2008 and 2011, moreover,
Plaintiff was treated only by her primary-care physician, and no
evidence showed that she had required hospitalization since her
alleged onset date. (Id.)

     Plaintiff argues that her lack of treatment was not a valid
reason for discounting her credibility because "'it is a
questionable practice to chastise one with a mental impairment
for the exercise of poor judgement in seeking rehabilitation.'"
(J. Stip. at 16 (quoting Regennitter v. Comm'r of Soc. Sec.
Admin., 166 F.3d 1294, 1299 (9th Cir. 1999)).) But nothing
indicates that Plaintiff's failure to report for treatment was a
result of her mental impairments. See Molina, 674 F.3d at
1113-14 (ALJ permissibly discounted credibility based on failure
to seek psychiatric care for anxiety disorder when "no medical
evidence" showed that claimant's resistence to treatment "was
attributable to her mental impairment rather than her own
personal preference").

     Plaintiff also argues that "part of her inability to obtain
proper treatment was due to the fact that she could not afford

31

treatment as she had no medical insurance," and that "once she
obtained access to Medi-Cal, she was able to resume better
treatment." (J. Stip. at 16.) But the ALJ expressly considered
and rejected this excuse, finding that Plaintiff was "provided
lists of low cost clinics in March 2011 and was urged to seek
treatment for her rheumatoid arthritis at county facilities
(Olive View, LAC+USC) in August 2012," but "the evidence clearly
indicates that she did not pursue these methods of treatment."
(AR 26; see also AR 323 (stating that Plaintiff would be provided
with list of low-cost clinics), 409 (referring Plaintiff to LAC-
USC or UCLA Olive View); see also AR 377 (Oct. 2011 counseling
note recommending that Plaintiff be referred to psychiatrist),
368 (Oct. 2011 counseling note stating that Plaintiff "has not
followed up with the referral yet").) Indeed, as the ALJ noted
(AR 25), Plaintiff claimed to be disabled in part because of
rheumatoid arthritis and asthma (AR 280; see also AR 232 (listing
problems with lifting, squatting, bending, standing, walking,
sitting, and kneeling)), but she apparently never reported
symptoms of those conditions to her treating physician during her
appointments (see AR 295-308, 365-66). This further undermines
Plaintiff's claim that she failed to pursue treatment because she
could not afford it.[20]

    The ALJ also noted that he had considered Plaintiff's
allegedly "fairly limited" activities of daily living but found

---

[20] Without citation to evidence, Plaintiff contends that
"[t]he county facilities in the local area have an extensive
waiting list and it is extremely difficult to get an
appointment." (J. Stip. at 17.) The Court declines to accept
Plaintiff's apparent invitation to assume that she diligently
sought appointments and was unable to get them.

that they were not "strong evidence in favor of finding" Plaintiff disabled.  (AR 23.)  The ALJ noted that the daily activities could not be "objectively verified with any reasonable degree of certainty" and that it was "difficult to attribute that degree of limitation" to Plaintiff's medical condition "in view of the relatively week medical evidence and other factors discussed in this decision."  (Id.)  Plaintiff may be correct that the ALJ improperly discounted Plaintiff's account of her daily activities because it could not be objectively verified. (J. Stip. at 14-15); see also Baxla v. Colvin, 45 F. Supp. 3d 1116, 1128 (D. Ariz. 2014) ("that '"a fact cannot be verified objectively provides little evidence to support the conclusion that the individual is not being truthful about such fact in any particular instance"'" (citation omitted)), appeal docketed, No. 14-17222 (9th Cir. Nov. 7, 2014).  As discussed above, however, the ALJ was entitled to rely on a lack of supporting medical evidence, among other reasons, to discount the credibility of Plaintiff's subjective complaints, including her allegations regarding her limited daily activities.[21]

---

[21]  Indeed, Plaintiff's daily activities do not appear to have been as limited as she alleged: according to Plaintiff's mother, when Plaintiff's son was with Plaintiff (which was 50 percent of the time), she drove him to and from school, helped him with homework, made sure he was showered and fed, interacted with him, and made sure "all his needs [were] met."  (See AR 211-12, 235-36.)  Plaintiff's mother also said that Plaintiff did her son's laundry once a week, prepared small meals for herself and her son when her mother was not home to cook, and sometimes shopped in stores for her son's clothing, school supplies, and food.  (AR 237-38.)  Moreover, in August 2011, Plaintiff reported to Dr. Jahan that she was able to eat, dress, and bathe independently; do some household chores, errands, shopping, and cooking; and manage her own money.  (AR 359.)

1    Reversal is not warranted on this ground.

2         C.   The ALJ Did Not Err in Assessing Plaintiff's Mother's

3              Third-Party Statements

4         Plaintiff contends that the ALJ failed to properly evaluate

5    Plaintiff's mother's statements.  For the reasons discussed

6    below, reversal is not warranted on this ground.

7         "In determining whether a claimant is disabled, an ALJ must

8    consider lay witness testimony concerning a claimant's ability to

9    work."  Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009)

10   (quoting Stout, 454 F.3d at 1053); see also § 404.1513(d)

11   (statements from spouses, parents, other relatives, and friends

12   can be used to show severity of impairments and effect on ability

13   to work).  Such testimony is competent evidence and "cannot be

14   disregarded without comment."  Bruce, 557 F.3d at 1115 (emphasis

15   in original) (quoting Nguyen v. Chater, 100 F.3d 1462, 1467 (9th

16   Cir. 1996)); Robbins, 466 F.3d at 885 ("[T]he ALJ is required to

17   account for all lay witness testimony in the discussion of his or

18   her findings.").  When rejecting the testimony of a lay witness,

19   an ALJ must give specific reasons germane to that witness.

20   Bruce, 557 F.3d at 1115; see also Stout, 454 F.3d at 1053;

21   Nguyen, 100 F.3d at 1467.

22        An ALJ's failure to address a lay witness's testimony is

23   harmless if it is "'inconsequential to the ultimate nondisability

24   determination' in the context of the record as a whole."  Molina,

25   674 F.3d at 1122 (citations omitted); see also Tommasetti v.

26   Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008); Carmickle, 533 F.3d

27   at 1162.  That happens when "the same evidence that the ALJ

28   referred to in discrediting [the claimant's] claims also

34

1  discredits [the lay witness's] claims." <u>Molina</u>, 674 F.3d at 1122
2  (alterations in original) (quoting <u>Buckner v. Astrue</u>, 646 F.3d
3  549, 560 (8th Cir. 2011)).

4       Here, Plaintiff submitted two third-party statements from
5  her mother, Patricia Lloyd.  (AR 211-18, 235-42.)  In the first,
6  dated December 2010, Lloyd stated that Plaintiff spent her days
7  "somber, sleeping, moody or crying more often than not."  (AR
8  211.)  The only time Plaintiff was "more active and focused" was
9  the three days a week her son was with her.  (<u>Id.</u>)  Lloyd stated
10 that on those days, Plaintiff drove her son to school, helped him
11 with his homework, made sure he was showered and fed, ensured
12 that "all his needs [were] met," and was "a wonderful mom to him
13 overall."  (AR 211-12.)  Lloyd stated that Plaintiff was
14 otherwise "very depressed."  (AR 211.)

15      Lloyd stated that Plaintiff often slept days and was up
16 until very late at night, no longer dressed up, skipped showers
17 "once in a while," and did not fix her hair.  (AR 212.)  Lloyd
18 generally did the cooking, but if she could not, Plaintiff would
19 "make sure she and her son have meals."  (AR 213.)  Plaintiff did
20 her and her son's laundry once a week but did no other chores.
21 (<u>Id.</u>)  She went out about once a day and could drive.  (AR 214.)
22 Plaintiff watched television and had "no social life at all."
23 (AR 215.)  Her condition affected her ability to talk, remember,
24 complete tasks, concentrate, and get along with others.  (AR
25 216.)  She could follow written instructions well and had a
26 "fair" ability to follow spoken instructions.  (AR 216.)  When
27 under stress, Plaintiff would get depressed and very sick to her
28 stomach, vomit, lose weight, and become "totally disabled."  (AR

35

217.)

In May 2011, Lloyd completed a second function report
containing a similar account of Plaintiff's symptoms.  (AR 235-
42.)  Lloyd also asserted that Plaintiff shopped in stores for
"her son's needs for school – supplies, or clothing, food, misc."
(AR 238.)

The ALJ accorded "little weight" to Lloyd's statements
because they were "simply not consistent with the preponderance
of the evidence in this case."  (AR 27.)  Plaintiff argues that
the ALJ should have "list[ed] evidence that is inconsistent with
the mother's description" of Plaintiff's symptoms (J. Stip. at
25), but as discussed above, the ALJ fully summarized the medical
evidence and discussed why it was inconsistent with Plaintiff's
account of her symptoms, which was nearly identical to Lloyd's.
See Valentine v. Comm'r of Soc. Sec., 574 F.3d 685, 694 (9th Cir.
2009) (holding that because "the ALJ provided clear and
convincing reasons for rejecting [claimant's] own subjective
complaints, and because [the lay witness's] testimony was similar
to such complaints, it follows that the ALJ also gave germane
reasons for rejecting [the lay witness's] testimony"); cf.
Molina, 674 F.3d at 1117 ("Where lay witness testimony does not
describe any limitations not already described by the claimant,
and the ALJ's well-supported reasons for rejecting the claimant's
testimony apply equally well to the lay witness testimony, it
would be inconsistent with our prior harmless error precedent to
deem the ALJ's failure to discuss the lay witness testimony to be
prejudicial per se.").  That Lloyd's statement was inconsistent
with the medical evidence was a germane reason for discounting

36

it.  See Bayliss, 427 F.3d at 1218 ("[i]nconsistency with medical evidence" is germane reason for discounting lay opinion); cf. Molina, 674 F.3d at 1122 (ALJ's failure to comment on lay-witness testimony harmless when evidence used to discredit claimant's claims also discredits lay witness's claims).

Moreover, as previously discussed, the ALJ permissibly discounted Plaintiff's testimony regarding her psychological symptoms based on her lack of consistent treatment.  (AR 26.) This reason applies equally to Lloyd's nearly identical statements.  As such, even if the ALJ somehow erred in discounting Lloyd's statement based on its inconsistency with the medical evidence, that error was harmless.  See Molina, 674 F.3d at 1117.

Plaintiff might be correct that the ALJ's other two reasons for discounting Lloyd's statement — that she was not "medically trained" and her allegations would "tend to be colored by affection" for Plaintiff (AR 27) — may not have been appropriate germane reasons.  (See J. Stip. at 23-24); § 404.1513(d)(4) (ALJ may use statements from nonmedical sources to show severity of impairments and how they affect claimant's ability to work); Smolen, 80 F.3d at 1289 ("The fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony."); but see Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006) (finding that claimant's former girlfriend's "close relationship" with claimant such that she was "possibly 'influenced by her desire to help him'" was germane reason to discount her lay-witness testimony (alteration omitted)).  But any error was harmless because the ALJ provided another, sufficient germane

reason for discounting Lloyd's statement.  <u>Cf</u>. <u>Carmickle</u>, 533

F.3d at 1162-63 (upholding credibility determination despite

errors when remaining reasons supporting it were valid).

Reversal therefore is not warranted on this ground.

**VI.   CONCLUSION**

Consistent with the foregoing, and under sentence four of 42

U.S.C. § 405(g),[22] IT IS ORDERED that judgment be entered

AFFIRMING the decision of the Commissioner and dismissing this

action with prejudice.  IT IS FURTHER ORDERED that the Clerk

serve copies of this Order and the Judgment on counsel for both

parties.


DATED: <u>August 28, 2015</u>        JEAN ROSENBLUTH
                                JEAN ROSENBLUTH
                                U.S. Magistrate Judge

---

[22] That sentence provides: "The [district] court shall have
power to enter, upon the pleadings and transcript of the record,
a judgment affirming, modifying, or reversing the decision of the
Commissioner of Social Security, with or without remanding the
cause for a rehearing."